UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| C.P. PACKAGING, INC. d/b/a OHLSON PACKAGING, ) ) ) Plaintiff, ) ) ) Civil Action No. v. ) 20-12041-FDS ) WILLIAM J. HALL and ) HART FOOD PRODUCTS, INC., ) ) Defendants. ) ) | |

**MEMORANDUM AND ORDER ON DEFENDANTS'
RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW**

**SAYLOR, C.J.**

This is an action for fraud involving misrepresentations about the contamination of food-packaging equipment. At trial, plaintiff C.P. Packaging d/b/a Ohlson Packaging argued that defendants William J. Hall and Hart Food Products, Inc. falsely claimed that food-packaging equipment sold by Ohlson had become contaminated with listeria. After a trial, the jury awarded a verdict for plaintiff and damages of $500,000.

Defendants have moved for judgment notwithstanding the verdict. They contend that the fraud claim is barred by the litigation privilege and claim preclusion; that there is insufficient evidence to support the elements of reliance and foreseeable harm; that the jury's damages award was speculative; and that the action is barred by the statute of limitations.

For the following reasons, the motion for judgment notwithstanding the verdict will be granted.

I.   **Background**

   A.   **The Parties**

C.P. Packaging d/b/a Ohlson Packaging ("Ohlson") is a Massachusetts corporation that manufactures commercial food-packaging equipment. (Compl. ¶¶ 1, 8). At the relevant time, it was owned and managed by John Ohlson, Jr. (Trial Tr. 2-43).

Hart Food Products, Inc. is a California corporation that packages and sells frozen-food products, including chicken nuggets with sauce packets. (Compl. ¶¶ 3, 7).

   B.   **Defendants' Conduct**

In December 2015, Hart entered a contract with Ohlson and its distributor, High Dream Machinery LLC, to buy several pieces of food-packaging equipment. (Trial Ex. 11). The equipment was delivered to Hart's California facility in February 2016. (Trial Tr. 3-69). Soon after installation, Hart identified issues with the equipment's functioning. (*Id.* 4-65). Ohlson sent technicians to service the machinery several times. (*Id.* 4-71).

In October 2016, Hart hired a food-safety consultant to inspect the equipment for compliance with U.S. Department of Agriculture regulations. (*Id.* 4-65). According to that consultant, the Ohlson equipment posed several sanitation risks due to its design, primarily possible contamination issues due to the difficulty of cleaning certain surfaces. (*Id.* 4-69).

In February 2017, Hart removed the Ohlson equipment and reinstalled its previous production line. (*Id.* 3-69). On February 15, 2017, Hall e-mailed Brad Ducorsky, the owner of High Dream Machinery, demanding a refund for the equipment and stating that he would "give [Ducorsky] and [Ohlson, Jr.] one last chance to make this right." (Trial Ex. 12). He wrote that "[i]f this goes to court we'll be asking for damages and all cost associated with the install of the equipment," and that he would "hand this over to [his] attorney if [he hadn't] received an agreement in writing" by February 25. (*Id.*).

After Ohlson declined to issue a refund, Hall sent Ducorsky another e-mail on February 16, 2017, stating:

> Bring your video evidence and see you in court. I have hours of videos and several expert testimonies. I've been busy accumulating evidence. Oh if we fin[d] Listeria when we have the independent lab come in and do the swa[bb]ing and it comes up in court or with USDA and we are forced into a recall costing us potentially millions of dollars that'll be on your guy's head too.

(Trial Ex. 13). On February 22, 2017, Hall wrote in a third e-mail:

> I am never anxious to file a lawsuit. But I've done it before and won't hesitate to do it again. . . . Your equipment doesn't work to spec and is dangerous to my employees and the people that consume our products. I have made a very generous offer that you nether accepted or declined. . . . I will not accept any counter offers after I authorize my attorney to prosecute this case. . . . Do you seriously think you can win this? I've got expert witness from within the industry. Non partisan health and safety inspectors. Former and current USDA officials. I've got the contaminated, defective and dangerous conveyors. I've got hours of videos. At leas[t] a dozen visits by your techs and you trying to fix this . . . . Have you shared our correspondence with John? Is he in the loop?

(Trial Ex. 14).

While communicating with Ducorsky, Hall included his attorney, Donald Forbes, on each e-mail as a recipient. (Trial Exs. 12-14). On February 22, 2017, the same day as the third e-mail to Ducorsky, Hall wrote privately to Forbes:

> We started Listeria testing independently several months ago and we're clean. That's not to say though that the improperly assembly equipment can't Harbor listeria where some of the sectional components of the conveyor hook up. Typically there's a 3/8 inch gap between connecting Metals so that you can clean them between them. They didn't do that. That's where we're going to find contamination. I know the product we[']re shipping out is clean though because of our continued testing but it's a roll of the dice on how long that's going to work. I'm sure you're seeing the point of my emails to them is to scare them. I want them to realize they're dealing with somebody who's kind of crazy and seriously pissed off. Someone who's committed to this and won't back down. . . . Let's see what happens on Friday and we'll move from there. BTW I would never ship any [products] that I thought might be hazardous. Unless you have an attorney in my area that you would strongly recommend I'm going to go with you.

(Trial Ex. 15).

3

In November 2016, John Ohlson, Jr., was engaged in preliminary discussions with several potential buyers for his company, during which he disclosed Hall's allegations of listeria contamination. There is no evidence that Hall was aware, at any relevant time, that Ohlson, Jr., was seeking to sell the company.

After a year of negotiations, Ohlson, Jr., eventually agreed to sell the company to Duravant LLC on December 31, 2017. (Trial Ex. 9). According to plaintiff, that price was substantially depressed due to Hall's allegations.

### C. Procedural Background

In August 2018, Hart initiated arbitration proceedings against Ohlson and High Dream pursuant to an arbitration clause in the contract for the equipment sale. During that proceeding, counsel for Hart disclosed the February 2017 e-mails between Hall and Forbes. Counsel for Ohlson introduced those e-mails as evidence during arbitration.

On November 13, 2020, Ohlson filed suit against Hall and Hart, alleging fraud (Count 1), tortious interference with advantageous business relations (Count 2), commercial disparagement (Count 3), and unfair and deceptive business practices in violation of Mass. Gen. Laws ch. 93A, § 11 (Count 4).

On August 5, 2021, the court (Zobel, J.) granted a motion to dismiss Count 2 and Count 3. On October 3, 2022, Judge Zobel denied defendants' motion for summary judgment based on lack of cognizable damages on Count 1 and Count 4. The case was reassigned to the undersigned judge in May 2023. The Court subsequently denied defendants' motion for summary judgment on Count 1 and Count 4 based on the absence of the real party in interest.

Two claims thus remained. The fraud claim (Count 1) alleged that Hall falsely claimed that the Ohlson equipment was contaminated or likely to be contaminated with listeria; that Ohlson, Jr., reasonably relied on those allegations in disclosing them to potential buyers; and

4

that, because of those disclosures, all but one potential buyer ceased negotiations, forcing a sale at a price below market value. The Chapter 93A claim (Count 4) alleged that Hall's knowingly false statements constituted unfair and deceptive business practices resulting in Ohlson being forced to accept a heavily discounted sales price.

A six-day jury trial was held beginning on June 5, 2023. After the close of plaintiff's evidence, the Court granted defendants' motion for judgment as a matter of law on the Chapter 93A claim and denied the motion as to the fraud claim. On June 12, 2023, the jury found that the fraud claim was not barred by the statute of limitations and rendered a verdict in plaintiff's favor. The jury awarded plaintiff $500,000 in damages.

On June 15, 2023, Ohlson moved to amend the judgment to reflect accrued prejudgment interest. On June 21, 2023, defendants renewed their motion for judgment as a matter of law under Fed. R. Civ. P. 50(b). They have also moved to disallow costs claimed by Ohlson.

## II. Legal Standard

A court may grant judgment as a matter of law after a trial if the record reveals no evidentiary basis for the verdict. FED. R. CIV. P. 50(b). A court should grant judgment as a matter of law "if a reasonable person could not have reached the conclusion of the jury." *White v. New Hampshire Dep't of Corr.*, 221 F.3d 254, 259 (1st Cir. 2000). The court must "construe the facts in the light most favorable to the jury verdict and draw any inferences in favor of the non-movant." *Sánchez v. Foley*, 972 F.3d 1, 11 (1st Cir. 2020).

## III. Analysis

Defendants have moved for judgment as a matter of law under Fed. R. Civ. P. 50(b). They contend that judgment in their favor is warranted because (1) the action is barred by the litigation privilege; (2) the action is barred by claim preclusion because it could have been raised during the arbitration proceedings, but was not; (3) there was insufficient evidence on the

element of reliance; (4) there was insufficient evidence on the element of foreseeability; (5) the jury's award was speculative; and (6) the action is barred by the statute of limitations. Because the Court determines that the action was barred by the litigation privilege, it will not address the remaining issues.

### A.     The Litigation Privilege

Massachusetts law "precludes civil liability based on communications made by a party, witness, or attorney in connection with judicial proceedings or contemplated litigation." *Bassichis v. Flores*, 490 Mass. 143, 144 (2022). The privilege is absolute and "applies regardless of malice, bad faith, or any nefarious motives . . . so long as the conduct complained of has some relation to the litigation." *Id.* at 646; *see also Doe v. Nutter, McClennen & Fish*, 41 Mass. App. Ct. 137, 140-41 (1996). "In Massachusetts, as in all States that have adopted this formulation, application of the privilege extends beyond statements that are made in the court room itself to 'communications preliminary to a proposed judicial proceeding,'" provided the proceeding is contemplated in good faith and under serious consideration. *Id.* at 150 (quoting *Sriberg v. Raymond*, 370 Mass. 105, 108 (1976)). It can also apply to attorneys' conduct in litigation. *Id.* at 156-60. The privilege originally developed to protect lawyers from defamation suits but has since expanded to civil liability more broadly. RESTATEMENT (SECOND) OF TORTS § 586 (1977); *Bassichis*, 490 Mass. at 151 (applying privilege to claim for fraudulent misrepresentation, and citing cases where privilege barred claims for intentional infliction of emotional distress, invasion of privacy, abuse of process, negligence, and violating Chapter 93A).

The privilege further extends beyond attorneys to parties, as "it is well-established that communications by a *party* preliminary to a proposed judicial proceeding also are entitled to protection, provided that legal action was contemplated when the allegedly defamatory statements were made." *Giuffrida v. High Country Inv., Inc.*, 73 Mass. App. Ct. 225, 242 (2008)

(emphasis added) (applying privilege to allegedly defamatory statements in letter when the writer reiterated intent to sue and eventually did sue based on accusations in her letter); *see also* RESTATEMENT (SECOND) OF TORTS § 587 (1977) ("A *party* to a private litigation . . . is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding . . . if the matter has some relation to the proceeding." (emphasis added)); *Visnick v. Caulfield*, 73 Mass. App. Ct. 809, 812-13 (2009) (applying privilege to allegedly libelous and slanderous statements made by a defendant in letter alleging that she intended to file a lawsuit based on plaintiff's harassment).

However, although the privilege protects speech, it does not extend to conduct, such as the act of filing a lawsuit. *Gillette Co. v. Provost*, 91 Mass. App. Ct. 133, 140-43 (2017). In essence, "'the privilege does not attach . . . where it is not the statements themselves that are said to be actionable,' such as where the statements are being used as evidence of the defendants' misconduct." *Haverhill Stem LLC v. Jennings*, 99 Mass. App. Ct. 626, 636-37 (2021) (quoting *Gillette*, 91 Mass. App. Ct. at 141) (finding threats to use litigation to obtain money and cause financial harm were not privileged because threats "fairly can be viewed as part of the conduct of extortion"). Determining whether the privilege applies may require a nuanced analysis of whether the claims at issue are based on speech or conduct and "is determined on a case-by-case basis, after a fact-specific analysis." *Fisher v. Lint*, 69 Mass. App. Ct. 360, 365-66 (2007).

B. **Whether the Sued-Upon Statements Were Made in Anticipation of Litigation**

Defendants contend that Hall's statements on listeria, which are the basis of the fraud claim, were made in good-faith anticipation of litigation, and thus cannot be the basis of liability. Plaintiff responds that Hall's statements were not truly made in contemplation of litigation, but to obtain a refund for the installed equipment.

7

At the outset, it appears clear that the e-mails were sent with the imminent prospect of litigation in mind. Each of Hall's February 2017 e-mails to Ducorsky raises the possibility of a lawsuit, and Hall's attorney was included as a recipient of every message. (Trial Exs. 13-14). That impression is strengthened by the fact that Hart actually sued Ohlson in August 2017 on claims directly related to the issues raised in the e-mails. Whether the listeria allegations were true is irrelevant, because the litigation privilege applies regardless of whether the statements were made in good faith, as long as they are related to the eventual litigation. *Bassichis*, 490 Mass. at 144. Here, there is a clear link between Hall's concerns over the functioning of the equipment, the allegations of listeria contamination, and the eventual lawsuit that Hall brought to recover the purchase price of that equipment. Furthermore, evidence that Hall was "angry" and trying to "scare" plaintiff do not necessarily mean that he was not seriously contemplating a lawsuit. (Trial Ex. 12). Indeed, those expressive statements were made in an e-mail to Forbes, his attorney, where he next wrote that "[u]nless you have an attorney in my area that you would strongly recommend I'm going to go with you," presumably indicating a readiness to employ Forbes's services in the event of an actual lawsuit. (Trial Ex. 15). Nor does the possibility that Hall used the listeria allegations as leverage to obtain a refund also mean he did not expect to file a suit; surely most parties to litigation would choose to avoid suing altogether if they could obtain the outcome they seek outside the courtroom.

Although this Court previously denied defendants' motion to dismiss based on their assertion of the litigation privilege, that holding was limited to reviewing the complaint alone and was expressly predicated on the need to determine whether litigation was anticipated when Hall wrote the e-mails at issue. (ECF No. 29 at 4-5 (Zobel, J.)); *see also Meltzer v. Grant*, 193 F. Supp. 2d 373, 376 (D. Mass. 2002) (declining to grant dismissal based on litigation privilege

8

when shareholder sent letter threatening a lawsuit against the company's founders because factual disputes existed as to whether litigation was seriously contemplated or in good faith). However, plaintiff adduced no evidence at trial to rebut the assertion that Hall meant what he said in his e-mails—that he would sue if necessary. Indeed, Hall's uncontroverted testimony at trial was that he planned to bring a lawsuit when he wrote them. (*See* Trial Tr. 4-70).

In light of the uncontroverted evidence, therefore, there is no reasonable basis for concluding that the statements were not made in good-faith contemplation of a lawsuit.

### C.   Whether the Privilege Applies to Evidence of Misconduct

Plaintiff also asserts that, even if Hall anticipated litigation, his statements were not protected by the privilege because they are evidence of a malicious purpose—specifically, an intent to harm plaintiff's business—and therefore constitute conduct rather than speech.

Massachusetts courts distinguish "between holding a speaker liable for the content of [his] speech, on the one hand, and using that speech as evidence of [his] misconduct, on the other." *58 Swansea Mall Drive v. Gator Swansea Prop.*, 2016 WL 5946872, at *1 (D. Mass. Oct. 12, 2016). The litigation privilege "applies in the former context, but not the latter." *Id.*; *see also Gillette*, 91 Mass. App. Ct. at 134 ("We further conclude that the litigation privilege does not bar the counterclaims because they seek to hold Gillette liable not for speech, but for conduct (its act of filing an allegedly groundless lawsuit), to which the privilege does not apply."); *Capital Allocation Partners v. Michaud*, 2012 WL 1948596, at *2 (Mass. App. Ct. May 31, 2012) (no privilege applied when "the statements described in the complaint [were] merely evidence from which an inference of a malicious purpose might [arise]").

None of those cases, however, involved allegedly privileged statements that formed the essential foundation of the particular claim at issue. In *58 Swansea Mall Drive*, the court determined that the privilege did not apply to letters sent by the defendant landlord claiming that

the plaintiff was in default of its lease. 2016 WL 5946872, at *1. The court concluded that the letters were evidence of the landlord's bad faith in attempting to force the tenant out of its lease, not the essential basis of the suit itself, and applying the privilege in such cases would lead to absurd results. *Id.* at *2. Similarly, in *Gillette*, the court held that the privilege did not apply when that defendant sent a letter threatening litigation to interfere in the plaintiff's business relationships. 91 Mass. App. Ct. at 141. The court concluded that the privilege did not attach because it was the interfering conduct that was actionable, not the statements themselves. *Id.* In *Capital Allocation Partners*, the court concluded that the privilege did not apply to certain letters from the defendant that served as evidence of malicious purpose, because the statements were not "themselves the defendants' alleged unfair and deceptive practice." 2012 WL 1948596, at *2. Finally, in *Larson v. Perry*, the court determined that an attorney's letter containing allegedly unlawful statements was not protected by the privilege because the plaintiff "plausibly allege[d] that the [defendants] used the letter as a means to effectuate unlawful ends, specifically to interfere with the [sued-on] contract . . . and extract unlawful concessions from [the plaintiff]." 2020 WL 1495883, at *6 (D. Mass. Mar. 27, 2020). In other words, the "unlawful ends" were the grounds for the plaintiff's claim, not the defendant's statements. *Id.*

      Here, the basis of plaintiff's fraud claim—indeed, its sole basis for asserting that claim—is that Hall falsely stated that the Ohlson equipment was contaminated or likely to be contaminated with listeria. Hall's statements thus did not amount to mere evidence of underlying misconduct, but are themselves the basis of its fraud claim. Without exception, those statements appeared alongside threats of bringing a lawsuit and involved his lawyer. Furthermore, they did, ultimately, result in a lawsuit. Again, it does not matter for the purposes of the litigation privilege whether those statements were false or malicious; it is sufficient that

Hall made them while contemplating litigation. There is no evidence that Hall knew that Ohlson, Jr., was seeking to sell his company, nor any other extrinsic unlawful motivation that would support construing his statements as conduct. The Court's instructions to the jury likewise confirm that the jury's verdict was based on whether Hall made a "false statement of fact," not whether he engaged in any underlying misconduct. In short, the only unlawful acts supporting plaintiff's fraud claim are Hall's statements, and those statements are protected by the litigation privilege.

Accordingly, because the litigation privilege barred the jury's consideration of the statements forming the sole basis for plaintiff's fraud claim, defendants' renewed motion for judgment as a matter of law will be granted.

### IV.  Conclusion

For the foregoing reasons, the motion of defendants William J. Hall and Hart Food Products, Inc. for judgment notwithstanding the verdict is hereby GRANTED. Plaintiff's motion to amend the judgment and its motion for costs are DENIED as moot.

**So Ordered.**

Dated:  October 20, 2023

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Chief Judge, United States District Court